**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MIA BRIDGEMAN,<br><br>        Plaintiff,<br><br>v.<br><br>DIVERSIFIED CONSULTANTS, INC.,<br><br>        Defendant. | Case No.<br><br><br>**COMPLAINT FOR DAMAGES UNDER THE FAIR DEBT COLLECTION PRACTICES ACT, THE OHIO CONSUMER SALES PRACTICES ACT, THE FLORIDA CONSUMER COLLECTION PRACTICES ACT AND OTHER EQUITABLE RELIEF**<br><br><br>**JURY TRIAL DEMANDED** |

## PARTIES

1.  Plaintiff, Mia Bridgeman ("Mia"), is a natural person who resided in Bedford, Ohio, at all times relevant to this action.

2.  Defendant, Diversified Consultants, Inc. ("DCI"), is a Florida corporation that maintained its principal place of business in Jacksonville, Florida, at all times relevant to this action.

## JURISDICTION AND VENUE

3.  Pursuant to 28 U.S.C. §1331, this Court has federal question jurisdiction over this matter as it arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.

4.  Pursuant to 28 U.S.C. §1367(a), the Court also has Supplemental Jurisdiction over Mia's claims under the Ohio Consumer Sales Practices Act, R.C. § 1345.02 (A) ("OCSPA") because they share a common nucleus of operative fact with Mia's claims under the FDCPA.

1

5.   Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over Mia's claims under the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. §§ 559.55, *et seq.*, because those claims share a common nucleus of operative facts with Mia's claims under the FDCPA.  S*ee LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185 (11th Cir. 2010) ("[FCCPA's] remedies are 'cumulative to other sanctions and enforcement provisions'" applicable to the debt collector).

6.   Mia is permitted to bring an FCCPA action against DCI in this Court because the FCCPA applies to Florida debt collectors, even when they are communicating with a non-Florida resident in connection with the collection of a debt.  *See Bank of Am., N.A.*, 2016 WL 2897410, *11 (S.D. Fla. May 18, 2016); *citing Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen.*, 761 So.2d 1256 (Fla. Dist. Ct. App. 3d 2000); *see also Mlynek v. Household Fin. Corp.*, 2000 WL 1310666, *4-5 (N.D. Ill. Sep. 13, 2000) (allowing Illinois resident to bring FCCPA action).

7.   Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

8.   At all times relevant to this action, DCI collected consumer debts.

9.   DCI regularly uses instrumentalities of interstate commerce and the mails to collect consumer debts owed or due or asserted to be owed or due another.

10.   The principal source of DCI's revenue is debt collection.

11.   DCI is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

12.   As described, *infra*, DCI contacted Mia to collect a debt that was incurred primarily for personal, family, or household purposes.

13. This alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5).

14. Mia is a "consumer" as defined by 15 U.S.C. § 1692a(3).

### *DCI'S COLLECTION PRACTICES AND TELEPHONE DIALING SYSTEM*

15. When placing calls to telephone numbers identified in accounts, DCI uses dialing services provided by LiveVox, Inc. ("LiveVox").

16. LiveVox is a hosted provider of telephone dialing services, which LiveVox's customers access remotely through the Internet.

17. Before DCI can begin using the LiveVox dialing systems, DCI electronically sends LiveVox a file of telephone numbers and the account numbers associated with those telephone numbers.

18. The telephone numbers are loaded into, and stored in, a "campaign database" located in New York.

19. If LiveVox determines that a telephone number identified in the account is provided by a cellular service carrier, LiveVox uses its LiveVox Human Call Initiator ("LiveVox HCI") telephone dialing system to place calls to that number.

20. An "automated call distributor" or "ACD," which is also located in New York, pulls telephone numbers from the campaign database and presents them to a "clicker agent" based on the availability of "closer agents" to participate in a conversation with the party to be called.

21. The clicker agents and closer agents are located at DCI's facility and login to LiveVox platforms through computers at their workstations.

22. The ACD is the primary component in the LiveVox HCI dialing system.

23. Once the telephone numbers and account information have been provided to LiveVox, the ACD presents telephone numbers to the clicker agent through an icon on the computer screen.

24. Each clicker agent sits in a cubicle with a computer screen in front of him or her.

25. The clicker agent then begins clicking on the telephone number icons using a mouse or the space bar on his or her keypad.

26. The sole function of the clicker agent is to click on the telephone number icons, which then transmits the telephone number to the next automated phase of the LiveVox HCI dialing system.

27. The clicker agent does not wear a headset or utilize any phone equipment to speak with any individuals who are called through use of the LiveVox HCI dialing system.

28. The clicker agent does not speak with any recipients of calls that are placed through the LiveVox HCI dialing system.

29. The clicker agent is never on the line when any call is placed and never hears any call being dialed.

30. The clicker agent is able to rapidly click on the telephone number icons so that a high volume of telephone numbers are transmitted to the media server within seconds.

31. Typically, the clicker agent clicks on more telephone number icons than there are available agents to take calls.

32. Even when there are consumers waiting on hold to be connected to a "closer agent," the clicker agents typically continue to click on telephone number icons.

33. No live agent is on the call when the LiveVox places the call to the carrier that LiveVox uses to connect the call.

34.  Instead, the media server uses automated voice detection technology to determine whether a live person answers the call or whether the call is forwarded to a voicemail system or answering machine.

35.  While the call is being placed, the closer agent is not on the line and does not hear the call dialing.

36.  If the LiveVox voice detection technology detects that the call was forwarded to a voicemail system or answering machine, the call is terminated without a message being left.

37.  If the media server detects that a live person answered the call, the media server then determines whether a closer agent is available to speak with the called party.

38.  If the media server detects that a live person answered the call and no closer agent is available to speak with the called party, the called party is placed on hold until a closer agent becomes available.

39.  For calls that the LiveVox voice detection technology identifies as having been forwarded to a voicemail system or answering machine, no live DCI agent is ever on the line during any period when the call is being placed.  It is only after the LiveVox HCI dialing system determines that a live person answered the call and a closer agent is available that a live DCI agent is finally joined to the call.

40.  When the clicker agent clicks on a telephone number icon on his or her computer screen, the number is transmitted to a media server, which utilizes an automated voice detection application ("AVDA") and places the call without a live agent being on the call.

41.  DCI is aware that the LiveVox HCI dialing system sometimes results in calls that are answered, but the AVDA incorrectly determines that the call was forwarded to a voicemail

system or answering machine and terminates the call by hanging up on the consumer or individual called.

42. Nevertheless, DCI does not regularly place manually dialed calls, with a live agent on the line, to the telephone number identified in the account to determine whether the calls it places are, in fact, being answered by the consumer or individual called.

43. DCI's use of LiveVox's HCI dialing system results in calls being answered by consumers, being misidentified by the AVDA, and the calls being terminated by DCI thorough LiveVox HCI system.

44. DCI's use of LiveVox HCI's dialing system causes many consumers to answer calls placed by the system where there are not live representatives available to take the call.

### *DCI'S CALLS AND COLLECTION EFFORTS AS TO MIA*

45. Within the past twelve months, around early 2018, DCI began calling Mia on her cellular phone ending in -7661 in connection with the collection of a debt.

46. DCI used the LiveVox HCI telephone dialing system to place calls to Mia's cellular phone number ending in -7661.

47. DCI called Mia on her cellular phone on an almost daily basis, multiple times a day.

48. DCI also called Mia's son ("Son") on Son's cellular telephone for purposes other than confirming or correcting Mia's location information.

49. DCI also continuously called Mia's husband ("Husband") on Husband's cellular telephone.

50. The calls from DCI to Mia, Husband and Son were automated.

51. On some occasions, when Mia, Husband and Son answered DCI's call, there was dead air on the line.

52.  On some occasions, the phone would ring several times and then disconnect before Mia, Husband or Son could answer DCI's call.

53.  On or around February 5, 2018, Mia answered one of DCI's calls.

54.  Initially, there was dead air, then after a short period of time, a live representative answered Mia's call.

55.  During this conversation, Mia communicated her desire that DCI cease calling Mia, Husband and Son.

56.  Mia provided DCI with Mia's cellular phone number, Mia's residential phone number, Mia's Husband's cellular phone number and Son's cellular phone number.

57.  Mia specifically told DCI to cease calling the phone numbers Mia provided.

58.  Nevertheless, DCI continued to call Mia, Husband and Son on an almost daily basis, multiple times a day, including as recent as May 2018.

59.  DCI's policy and practice is that when a consumer communicates his or her desire that DCI cease calling, but does not do so in writing, DCI disregards that communication as if it had not been made.

60.  In this case, DCI followed the aforementioned policy and practice when Mia communicated her desire that DCI stop calling her.

61.  DCI's policy and practice is that when a consumer communicates his or her desire that DCI cease calling, but does not do so in writing, DCI does not record that request in DCI's records related to the debt DCI is seeking to collect from the consumer.

62.  DCI's policy and practice is to call consumers using different phone numbers for the specific purpose of concealing that the calls are from DCI.

63.  In this case, DCI followed the aforementioned policy and practice when it placed calls to

Mia.

64.  DCI's collection efforts, including but not limited to its telephone calls and their use of

LiveVox's HCI dialing system, caused Mia emotional distress in the form of frustration,

annoyance, aggravation, and anxiety.

65.  DCI's aforementioned policies and procedures also caused Mia emotional distress in the

form of frustration, annoyance, aggravation, and anxiety.

### *LEGAL ARGUMENTS COMMON TO ALL COUNTS*

66.  Section 1692d of the FDCPA provides, in part:

> A debt collector may not engage in any conduct the natural consequence of which is
> to harass, oppress, or abuse any person in connection with the collection of a debt.

*See* 15 U.S.C. § 1692d.

67.  "[W]hether the natural consequence of [a] debt collector's telephone calls is harassment

[depends on]…the nature of the phone calls – their frequency and intent." *See Spencer v.*

*Receivables Performance Mgmt.*, 2013 U.S. Dist. LEXIS 29696, *6 (S.D. Tex. Mar. 4,

2013).

68.  Where a consumer has communicated his or her desire that a debt collector stop calling,

and the debt collector nonetheless continues to call the consumer, the volume and pattern

of the calls may evidence intent to harass in violation of Section 1692d.  *See Brandt v. I.C.*

*Syst., Inc.*, 2010 U.S. Dist. LEXIS 14588, *3-6 (M.D. Fla. Feb. 19, 2010) (once plaintiff

told defendant to stop calling him, ***each subsequent phone call violated 15 U.S.C.***

***§ 1692d***); *see also Stuart v. AR Resources, Inc.*, 2011 U.S. Dist. LEXIS 27025, *7-8 (E.D.

Penn. Mar. 16, 2011); *Shand-Pistilli v. Professional Account Servs, Inc.*, 2010 U.S. Dist

8

LEXIS 75056, *10-12 (E.D. Penn July 26, 2010); *Majeski v. I.C. Sys., Inc.*, 2010 U.S. Dist.

LEXIS 1830, *5-7 (N.D. Ill. Jan. 8, 2010).

69.    Section 1692f of the FDCPA provides, in part:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.

*See* 15 U.S.C. § 1692f.

70.    Where a question exists as to whether a debt collector's alleged misconduct violates Section 1692f or some other section of the FDCPA, the prudent course at the pre-trial stage is to allow the consumer to pursue claims under both sections.  *See Davis v. Diversified Consultants, Inc.*, 2014 U.S. Dist. LEXIS 87867, *25 (D. Mass. June 27, 2014); *citing Rush v. Portfolio Recovery Associates, LLC*, 977 F. Supp. 2d 414, 432 (D.N.J. 2013).

71.    DCI's maintenance of policies and practices, which in themselves violate the FDCPA, is further evidence of DCI's intent to harass consumers.  *See Anchondo v. Anderson, Crenshaw & Associates, L.L.C.,* 256 F.R.D. 661, 2009 U.S. Dist. LEXIS 32369 (D. N.M. Mar. 16, 2009) (debt collector's intent to violate the FDCPA may be inferred by its maintenance of policies and procedures which, in themselves, violate the FDCPA); s*ee also Kromelbein v. Envision Payment Solutions, Inc.*, 2013 U.S. Dist. LEXIS 107762, *18 (M.D. Penn. Aug. 1, 2013)("company policy can be just as much a violation of [the FDCPA] as the rogue act of an individual employee.  If anything, a company policy that violates the FDCPA is a more egregious transgression because it indicates endemic, rather than isolated, disregard for debtor rights.").

## COUNT ONE

### Violation of the Fair Debt Collection Practices Act

72.   Mia re-alleges and incorporates by reference Paragraphs 8 through 71 above as if fully set forth herein.

73.   DCI violated 15 U.S.C. § 1692c(a)(1) by calling Mia at a time or place known to be inconvenient for Mia.

## COUNT TWO

### Violation of the Fair Debt Collection Practices Act

74.   Mia re-alleges and incorporates by reference Paragraphs 8 through 71 above as if fully set forth herein.

75.   DCI violated 15 U.S.C. § 1692c(b) by communicating with a third party in connection with the collection of the debt without Mia's consent.

## COUNT THREE

### Violation of the Fair Debt Collection Practices Act

76.   Mia re-alleges and incorporates by reference Paragraphs 8 through 71 above as if fully set forth herein.

77.   In order to establish a violation of Section 1692d of the FDCPA, a consumer need not prove intentional conduct by the debt collector. *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2nd Cir. 2010); *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2013) ("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because intent is irrelevant" in a § 1692d claim).

78.   "Instead, applying an objective standard, as measured by the 'least sophisticated consumer,' the consumer need only show that the likely effect of the debt collector's communication or

conduct could be construed as harassment, oppression or abuse." *See Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 721 (S.D. Tex. 2012).

79. The likely effect of DCI's debt collection efforts, as measured by the "least sophisticated consumer" standard, was "to harass, oppress, or abuse" Mia.

80. DCI violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Mia in connection with the collection of the debt.

## COUNT FOUR

### Violation of the Fair Debt Collection Practices Act

81. Mia re-alleges and incorporates by reference Paragraphs 8 through 71 above as if fully set forth herein.

82. DCI violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect the debt.

## COUNT FIVE

### Violation of the Ohio Consumer Sales Practices Act

83. Mia incorporates each of the preceding allegations as if specifically stated herein.

84. DCI's actions in attempting to collect the alleged debt from Mia as described above constitute a "consumer transaction" as defined in Ohio Rev. Code § 1345.01(A)

85. DCI's actions and omissions described above constitute unfair, deceptive and unconscionable acts and practices, in violation of Ohio Rev. Code §§1345.01 and 1435.02 and the substantive rules promulgated under the OCSPA

86. DCI, as an individual and through its agents and employees, knowingly committed the unfair and unconscionable acts and practices described above.

87. DCI violated the OCSPA.

## COUNT SIX

### Violation of the Florida Consumer Collection Practices Act

88. Mia re-alleges and incorporates by reference Paragraphs 8 through 71 above as if fully set forth herein.

89. At all times relevant to this action, DCI is subject to and must abide by Florida law, including the FCCPA, Fla. Stat. § 559.72.

90. DCI is a "debt collector" as that term is defined in the FCCPA, Fla. Stat. § 559.55(7).

91. Mia is a "consumer" as defined by the FCCPA and is a person whom the act was intended to protect, FCCPA, Fla. Stat. § 559.55(2).

92. DCI attempted to collect a "debt" within the meaning of FCCPA, Fla. Stat. § 559.55(1).

93. DCI willingly and knowingly violated Fla. Stat. § 559.72(7) by communicating with Mia with such frequency as can reasonably be expected to harass Mia, or Mia's family members or engaging in other conduct which can reasonably be expected to abuse or harass Mia or Mia's family members.

94. As a result of the above violations of the FCCPA, DCI is liable to Mia for actual damages, statutory damages, and reasonable attorney's fees and costs, pursuant to Fla. Stat. §559.77(2).

95. Based upon the willful, intentional, knowing, grossly negligent, repetitive and continuous conduct as described herein, Mia is also entitled to an award of punitive damages in accordance with Fla. Stat. §§ 559.77 and 768.72.

### JURY DEMAND

96. Mia demands a trial by jury.

**PRAYER FOR RELIEF**

97.   Mia prays for the following relief:

a.   Judgment against DCI for actual damages, statutory damages, and costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k.

b.   Judgment against each and every Defendant for three times the amount of all actual damages suffered, Statutory damages for each violation of the OCSPA and reasonable attorneys fees, witness fees, court costs, and other litigation costs incurred by Plaintiff pursuant to the OCSPA.

c.   Judgment against DCI for actual damages, statutory damages, costs, reasonable attorney's fees, and punitive damages pursuant to Fla. Stat. §§ 559.77 and 768.72.

d.   For such other legal and/or equitable relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED,

Date: June 1, 2018

By:___ /s/ Jeffrey S. Hyslip_____
Jeffrey S. Hyslip, Esq.
HYSLIP & TAYLOR, LLC, LPA
3323 W. Diversey Avenue, Suite 5
Chicago, IL  60647
Phone: 312-380-6110
Fax: 312-361-3509
Email: jeffrey@lifetimedebtsolutions.com
Ohio Bar No. 0079315

*Attorney for Plaintiff*